## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| DENNIS PALKON, derivatively on behalf of CENTURYLINK, INC., | : | Civil Action No. |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| GLEN F. POST, III, R. STEWART EWING, JR., KAREN PUCKETT, MAXINE MOREAU, STACEY W. GOFF, JAMES E. OUSLEY, WILLIAM A. OWENS, W. BRUCE HANKS, VIRGINIA BOULET, PETER C. BROWN, RICHARD A. GEPHARDT, GREGORY J. MCCRAY, C.G. MELVILLE, FRED R. NICHOLS, HARVEY P. PERRY, MICHAEL J. ROBERTS, LAURIE A. SIEGEL and JOSEPH R. ZIMMEL, | : : : : : : : : : : : : : | **JURY TRIAL DEMANDED** |
| | : | |
| Defendants, | : | |
| | : | |
| and | : | |
| | : | |
| CENTURYLINK, INC., | : | |
| | : | |
| Nominal Defendant. | | |

### VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1.      Plaintiff Dennis Palkon ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant CenturyLink, Inc. ("CenturyLink" or the "Company") against certain members of its Board of Directors (the "Board") and executive officers, seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment from 2012 to the present (the "Relevant Period").

### NATURE OF THE ACTION

2.      According to its public filings, CenturyLink is a telecommunications company

- 1 -

that provides communications and data services to residential, business, governmental, and wholesale customers.

3.    Throughout the Relevant Period, CenturyLink paid an extremely high dividend of 7.25%.  As set forth herein, defendants continuously and falsely represented that the Company was financially capable of maintaining that outsized dividend payment.

4.    As a result of defendants' materially false and misleading statements, CenturyLink common stock traded as high as $42.99 on September 6, 2012.

5.    Throughout the Relevant Period, defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operation, and prospects.  Specifically, defendants made false and/or misleading statements and/or failed to disclose: (a) that defendants were planning to drastically alter the Company's capital allocation plans by: (i) committing a significant amount of free cash flow to the repurchase of billions of dollars of CenturyLink common stock; and (ii) significantly altering the Company's dividend policy; and (b) that defendants' statements about the Company's financial well-being, future business prospects, and ability to maintain hefty dividend payments lacked any reasonable basis when made.

6.    At the same time that the defendants were causing the price of CenturyLink stock to be artificially inflated, and while in possession of material, adverse, non-public information, several of the defendants sold a massive number of shares of their personally held CenturyLink stock, reaping enormous proceeds.  These defendants included six CenturyLink directors: defendants Glen F. Post, III ("Post"), William A. Owens ("Owens"), Richard A. Gephardt ("Gephardt"), C.G. Melville ("Melville"), Fred R. Nichols ("Nichols") and Joseph R. Zimmel ("Zimmel").

7.      After the market closed on February 13, 2013, defendants disclosed that they were immediately slashing the Company's quarterly dividend by over 25%, from $0.725 per share to $0.54 per share.  At the same time, defendants announced authorization to repurchase up to $2 billion of the Company's outstanding common stock.

8.      On this news, CenturyLink stock dropped from $41.69 per share on February 13, 2013 to close at $32.27 per share on February 14, 2013, a decline of over 22%.  The share price has not recovered to any appreciable extent.

9.      Accordingly, as a result of defendants' breaches, the Company has been damaged.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiff and defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

11.      Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district.  One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## THE PARTIES

12.      Plaintiff is a current shareholder of CenturyLink and has continuously held CenturyLink stock since June 2008.  Plaintiff is a citizen of Pennsylvania.

13.     Nominal defendant CenturyLink is a Louisiana corporation, with its principal executive offices at 100 CenturyLink Drive, Monroe, Louisiana, 71203.  According to its public filings, CenturyLink is a telecommunications company that provides communications and data services to residential, business, governmental, and wholesale customers.

14.     Defendant Post has served as the Company's Chief Executive Officer ("CEO") since 1992 and as President since July 1, 2009 (as well as from 1990 until 2002).  Previously, defendant Post served as Chairman of the Board from June 2002 until June 2009, and Vice Chairman of the Board from 1993 until 2002.  Post has served as a director of the Company since 1985.  Between 1976 and 1993, Post held various other positions at CenturyLink, including Treasurer, Chief Financial Officer ("CFO") and Chief Operating Officer ("COO").  Upon information and belief, defendant Post is a citizen of Louisiana.

15.     Defendant R. Stewart Ewing, Jr. ("Ewing") has served as the Company's Executive Vice President ("EVP"), CFO and Assistant Secretary since 2009.  Previously, defendant Ewing served as the Company's EVP and CFO from 1999 until 2009, and as Senior Vice President ("SVP") and CFO from 1989 until 1999.  Upon information and belief, defendant Ewing is a citizen of Louisiana.

16.     Defendant Karen Puckett ("Puckett") has served as the Company's EVP and COO since 1999.  Previously, Puckett served as the Company's President and COO from 2002 until 2009, and as EVP and COO from 2000 until 2002. Upon information and belief, defendant Puckett is a citizen of Louisiana.

17.     Defendant Maxine Moreau ("Moreau") has served as the Company's SVP, Network Services since 2012.  Previously, defendant Moreau served as SVP, Integration and Process Improvement from 2010 until 2012.  Upon information and belief, defendant Moreau is

a citizen of Louisiana.

18.     Defendant Stacey W. Goff ("Goff") has served as the Company's EVP, General Counsel and Secretary since 2009.  Previously, Goff served as SVP, General Counsel and Corporate Secretary from 2003 until 2009, and as Vice President and Assistant General Counsel from 2001 until 2003.  Upon information and belief, defendant Goff is a citizen of Louisiana.

19.     Defendant James E. Ousley ("Ousley") has served as CEO, Savvis, and President, Enterprise Markets Group since 2012.  Previously, Ousley served as CEO, Savvis from 2011 until 2012.  Upon information and belief, defendant Ousley is a citizen of Minnesota.

20.     Defendant Owens has served as a director of the Company and as non-executive Chairman of the Board since 2009.  Upon information and belief, defendant Owens is a citizen of Washington.

21.     Defendant W. Bruce Hanks ("Hanks") has served as a director of the Company since 1992.  Between August 1980 and March 2001, defendant Hanks held various positions at CenturyLink, including COO, SVP—Corporate Development and Strategy, CFO, SVP—Revenues and External Affairs, and President—Telecommunications Services.  In addition, defendant Hanks served as Chair of the Company's Audit Committee (the "Audit Committee") during the Relevant Period.  Upon information and belief, defendant Hanks is a citizen of Louisiana.

22.     Defendant Virginia Boulet ("Boulet") has served as a director of the Company since 1995.  Upon information and belief, defendant Boulet is a citizen of Louisiana.

23.     Defendant Peter C. Brown ("Brown") has served as a director of the Company since 2009.  In addition, defendant Brown served as a member of the Audit Committee during the Relevant Period.  Upon information and belief, defendant Brown is a citizen of Missouri.

24.     Defendant Gephardt has served as a director of the Company since 2009.  Upon information and belief, defendant Gephardt is a citizen of Missouri.

25.     Defendant Gregory J. McCray ("McCray") has served as a director of the Company since 2005.  Upon information and belief, defendant McCray is a citizen of the United Kingdom.

26.     Defendant Melville has served as a director of the Company since 1968.  Upon information and belief, defendant Melville is a citizen of Louisiana.

27.     Defendant Nichols has served as a director of the Company since 2003.  Upon information and belief, defendant Nichols is a citizen of Texas.

28.     Defendant Harvey P. Perry ("Perry") has served as a director of the Company since 1990.  Upon information and belief, defendant Perry is a citizen of Louisiana.

29.     Defendant Michael J. Roberts ("Roberts") has served as a director of the Company since 2011.  In addition, defendant Roberts served as a member of the Audit Committee during the Relevant Period.  Upon information and belief, defendant Roberts is a citizen of Illinois.

30.     Defendant Laurie A. Siegel ("Siegel") has served as a director of the Company since 2009.  Upon information and belief, defendant Siegel is a citizen of New Jersey.

31.     Defendant Zimmel has served as a director of the Company since 2003.  In addition, defendant Zimmel served as a member of the Audit Committee during the Relevant Period.  Upon information and belief, defendant Zimmel is a citizen of Connecticut.

32.     Collectively, defendants Post, Ewing, Puckett, Moreau, Goff, Ousley, Owens, Hanks, Boulet, Brown, Gephardt, McCray, Melville, Nichols, Perry, Roberts, Siegel and Zimmel shall be referred to herein as "Defendants."

33.    Collectively, defendants Hanks, Brown, Roberts and Zimmel shall be referred to as the "Audit Committee Defendants."

34.    Collectively, defendants Puckett, Goff, Post, Melville, Moreau, Nichols, Zimmel, Owens, Gephardt and Ousley shall be referred to as the "Insider Selling Defendants."

## DEFENDANTS' DUTIES

35.    By reason of their positions as officers, directors, and/or fiduciaries of CenturyLink, and because of their ability to control the business and corporate affairs of CenturyLink, Defendants owed CenturyLink and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage CenturyLink in a fair, just, honest, and equitable manner.  Defendants were and are required to act in furtherance of the best interests of CenturyLink and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to CenturyLink and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

36.    Defendants, because of their positions of control and authority as directors and/or officers of CenturyLink, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with CenturyLink, each of the Defendants had knowledge of material non-public information regarding the Company.

37.    To discharge their duties, the officers and directors of CenturyLink were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of CenturyLink

were required to, among other things:

    a.  Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

    b.  Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations, and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

    c.  When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

38.    Defendants were required to comply with CenturyLink's Code of Conduct (the "Code").  Pursuant to the Code:

As a CenturyLink team member, you may become aware of material, non-public information – that is, information that is not publicly available and that could reasonably lead a person to buy or sell CenturyLink securities or the securities of another company. ***You must never use material, non-public information (even if you acquired it as a "tip" from others) to trade – or advise or assist another person in trading – in CenturyLink securities*** or the securities of another company.  Insider trading is a serious violation of the law and can result in severe civil or criminal penalties, including imprisonment. [Emphasis added.]

39.    Pursuant to the Audit Committee's Charter, the members of the Audit Committee are required, *inter alia*, to:

    a.  Review with the management the quality and adequacy of internal controls that could significantly affect the Company's financial statements;

    b.  Review any issues that arise with respect to the quality or integrity of the Company's financial statements;

    c.  Discuss with management the quality and adequacy of the Company's disclosure controls and procedures;

    d.  Discuss with management the earnings press release, financial information and earnings guidance to be provided to investors, analysts, or rating agencies; and

    e.  Review and discuss with management the Company's quarterly and annual financial statements;

## SUBSTANTIVE ALLEGATIONS

### A.    Company Background

40.    According to its public filings, the Company is a telecommunications company that provides communications and data services to residential, business, governmental, and wholesale customers.

41.    CenturyLink is the third-largest telecommunications company in the United States.  A large part of CenturyLink's business is individual "land lines".  While extremely lucrative, the business is slowly dying.  For example, for the 12 months ended September 2012, the Company lost 6% of its individual telephone lines, a decline of 857,000 lines.  Nevertheless, CenturyLink still had 13.9 million individual telephone lines in 37 states and was working to diversify into other growing areas -- such as cloud computing.  Moreover, the Company remained solidly profitable, with 2011 earnings of $573 million.

42.    Given the evolving nature of the business, CenturyLink's stock price has not appreciated much in several years.  In order to keep investors happy, however, Defendants offered the Company's shareholders a large dividend of $2.90 a share.  Analysts, investors, and management were all well aware of the fact that Company's stock price was being maintained by the dividend.  As Donna Jaegers, an analyst with D.A. Davidson & Co. of Great Falls, Montana told the *Minneapolis Star Tribune,* "[i]f they cut the dividend, the stock price would go lower."

43.    Accordingly, information about the Company's financial strength and its dividend was critical to investors.

### B.    Defendants' False and Misleading Statements

44.    On August 8, 2012, Defendants issued a press release that stated, in relevant part:

Achieved operating revenues of $4.61 billion, exceeding guidance.

Improved annual rate of revenue decline to 1.2% in second quarter 2012 compared to 3.8% and 2.7% annual declines in pro forma second quarter 2011 and first quarter 2012, respectively.

Achieved Adjusted Diluted EPS 1, 2 of $0.65 compared $0.69 in pro forma second quarter 2011.

***Generated Free Cash Flow of $779 million, excluding special items***

CenturyLink, Inc. (NYSE: CTL) today reported strong operating revenues, operating cash flow, and free cash flow for second quarter 2012.

***"CenturyLink continued to generate solid results in the second quarter, maintaining our top-line revenue trend improvement and strong cash flow generation," said Glen F. Post, III,*** chief executive officer and president. "We successfully completed our operating group restructuring during the second quarter without disrupting the positive sales momentum across our business and believe that CenturyLink is even better positioned to serve our enterprise customers across the United States and internationally.

"We experienced continued broadband and Prism TV subscriber growth in the second quarter, in spite of typical lower seasonal demand, while continuing to improve customer retention as our annual access line loss rate of decline slowed to 6.1% this quarter from 7.4% in the pro forma year-ago period. We generated 5.8% sequential and 7.9% year-over-year growth in colocation a11d managed hosting revenues and grew strategic data revenues across our Regional Markets Group (RMG) and Enterprise Markets Group (EMG).

"As we enter the second half of 2012, we remain focused on investing in broadband expansion and enhancement Prism TV, fiber-to-the-tower, and managed hosting and cloud computing services in order to maximize the opportunities for future revenue growth," said Post.

**Second Quarter Highlights**

CenturyLink continued to improve its top-line revenue trend, deliver solid subscriber results, invest in key strategic initiatives and meet its Qwest and Savvis synergy targets in second quarter 2012. Among the quarter's highlights:

Improved year-over-year actual-to-pro forma revenue trend to a 1.2% rate of decline (1.7% rate of decline excluding data integration revenue), compared to a 3.8% decline in pro forma second quarter 2011.

***Achieved free cash flow of $779 million***, excluding special items and integration-related capital expenditures.

Reduced access line loss by 22% as the line loss trend improved during second quarter 2012 to a 6.1% annual decline compared to a 7.4% annual decline in pro forma second quarter 2011.

Added more than 18,000 high-speed Internet customers reflecting expected second quarter seasonality; ended second quarter 2012 with 5.76 million subscribers.

Expanded the number of Prism TV subscribers by 11% in second quarter 2012 from first quarter 2012 and increased penetration of available homes in our markets to more than 9%.

Generated sequential recurring revenue growth in our Enterprise Markets Group's Network Services and Data Hosting Services, along with strong bookings in both operating groups.

As of June 30, 2012, we had more than 50 data centers in North America, Europe, and Asia, with total sellable floor space of approximately 1.4 million square feet. [Emphasis added.]

45.     On August 9, 2012, Defendants caused CenturyLink to file a Form 10-Q with the U.S. Securities and Exchange Commission ("SEC") setting forth the financial results for the second quarter of 2012.  That 10-Q stated, in relevant part:

We have generally relied on cash provided by operations and our revolving credit facility to fund our operating and capital expenditures, make our dividend payments and repay a portion of our maturing debt. ***Our operations have historically provided a stable source of cash flow that has helped us meet the needs of the business.***

\* \* \*

***We anticipate that our existing cash balances and net cash provided by operating activities will enable us to meet our other current obligations, fund capital expenditures, and pay dividends to our shareholders.*** We also may draw on our revolving credit facility as a source of liquidity if and when necessary.

***We currently expect to continue our current annual dividend of $2.90 per common share,*** subject to our board's discretion. [Emphasis added.]

46.     In addition, pursuant to the Sarbanes-Oxley Act of 2002, the Form 10-Q contained signed certifications ("SOX Certifications") by defendants Post and Ewing, stating that the financial information contained in the Form 10-Q was accurate, and that any material changes to the Company's internal control over financial reporting were disclosed.  The SOX Certifications set forth:

I, [Glen F. Post, III, Chief Executive Officer and President/R. Stewart Ewing, Jr., Executive Vice President, Chief Financial Officer and Assistant Secretary], certify that:

1. I have reviewed this quarterly report on Form 10-Q of CenturyLink, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's Board of Directors:

> a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

> b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

*   *   *

Each of the undersigned, acting in his capacity as the Chief Executive Officer or Chief Financial Officer of CenturyLink, Inc. ("CenturyLink"), certifies that, to his knowledge, the Quarterly Report on Form 10-Q for the quarter ended June 30, 2012 of CenturyLink fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934 and that the information contained in the Form 10-Q fairly presents, in all material respects, the financial condition and results of operations of CenturyLink as of the dates and for the periods covered by such report.

A signed original of this statement has been provided to CenturyLink and will be retained by CenturyLink and furnished to the Securities and Exchange Commission or its staff upon request.

47.    On August 21, 2012, Defendants announced that the Board had voted to declare a quarterly cash dividend of $0.725 per share.

48.    On November 7, 2012, Defendants issued a press release entitled "CenturyLink Reports Third Quarter 2012 Earnings."  The press release stated, in relevant part:

Achieved operating revenues of $4.57 billion, in line with guidance.

Improved year-over-year rate of revenue decline to 1.3% in third quarter 2012 compared to 4.6% year-over-year decline in pro forma third quarter 2011.

Realized strong growth in high-speed Internet subscribers of more than 44,000 during third quarter 2012.

Achieved Adjusted Diluted EPS of $0.66 compared to $0.61 in pro forma third quarter 2011.

***Generated Free Cash Flow of $905 million,*** excluding special items.

- 13 -

CenturyLink, Inc. (NYSE: CTL) today reported strong operating revenues, operating cash flow and free cash flow for third quarter 2012.

"CenturyLink's third quarter results reflect our continued progress toward top line revenue stabilization, successful integration of the Qwest and Savvis operations and alignment of our operating costs with our revenue and growth opportunities," said Glen F. Post, III, chief executive officer and president.

"Our Enterprise Markets-Network team achieved recurring revenue growth for the third straight quarter driven by solid customer retention and the increasing revenue contribution from enterprise customers added earlier this year. We continue to see strong demand for network services from enterprise customers as we recorded solid quarterly bookings and exited the quarter with a strong sales funnel.

"Our strategic revenues continued to increase in our Regional Markets and Enterprise Markets operations; however, as previously discussed, we did experience modest strategic Wholesale Markets revenue compression as wireless carriers continue to migrate from copper-based to fiber-based connections.

"We are pleased with the continued progress we made during the third quarter toward stabilizing top-line revenue and we believe our continued investment in our key strategic opportunities will help drive enhanced shareholder value," Post said.

**Third Quarter Highlights**

Improved year-over-year actual-to-pro forma revenue trend to a 1.3% rate of decline

(1.4% rate of decline excluding data integration revenue), compared to a 4.6% decline in pro forma third quarter 2011.

***Achieved free cash flow of $905 million, excluding special items and integration-related capital expenditures.***

Added more than 44,000 high-speed Internet customers; ended third quarter 2012 with over 5.8 million subscribers.

Reduced access line loss by 22% compared to third quarter 2011, as the line loss trend improved during third quarter 2012 to a 5.8% annual decline compared to a

7.1% annual decline in third quarter 2011.

Expanded the number of Prism TV subscribers by 11% in third quarter 2012 from second quarter 2012, ending the quarter with more than 104,000 subscribers in service.

Generated sequential recurring revenue growth in our Enterprise Markets-Network and Enterprise Markets - Data Hosting segments.

- 14 -

Opened a data center in Singapore, bringing total data centers to 53 throughout North America, Europe and Asia, with total sellable floor space of approximately 1.4 million square feet. [Emphasis added.]

49.     On November 8, 2012, Defendants caused CenturyLink to file a Form 10-Q with the SEC setting forth the financial results for the second quarter of 2012.  The Form 10-Q stated, in relevant part:

We have generally relied on cash provided by operations and our revolving credit facility to fund our operating and capital expenditures, make our dividend payments and repay a portion of our maturing debt. Our operations have historically provided a stable source of cash flow that has helped us meet the needs of the business.

* * *

We anticipate that our existing cash balances and net cash provided by operating activities will enable us to meet our other current obligations, fund capital expenditures and pay dividends to our shareholders.

* * *

We currently expect to continue our current annual dividend of $2.90 per common share, subject to our board's discretion. [Emphasis added.]

50.     The Form 10-Q also contained SOX Certifications, signed by defendants Post and Ewing, which were substantially similar to those set forth above.

51.     On November 13, 2012, Defendants announced that the Board voted to declare a quarterly cash dividend of $0.725 per share.

## C.     The Truth Begins To Emerge

52.     On February 13, 2013, Defendants issued a press release entitled "CenturyLink revises capital allocation strategy."  The press release stated in relevant part:

CenturyLink, Inc. (NYSE: CTL) today announced that the company's board of directors has authorized certain capital allocation initiatives that further enable its strategy of investing in key drivers to stabilize and grow operating revenues.

***The CenturyLink board has authorized the repurchase of up to an aggregate $2.0 billion of the company's outstanding common stock.*** The company expects to execute this share repurchase program primarily in open market transactions, subject to market conditions and other factors, and expects to complete the

- 15 -

program by its scheduled termination date of February 13, 2015. CenturyLink intends to fund the share repurchase program primarily with free cash flow generated by the business.

***In connection with the new repurchase program, the board also indicated its intention to revise the company's quarterly dividend rate to $0.54 from $0.725 per share. The board expects to approve this new rate at its next regularly-scheduled meeting on February 26, 2013, with the change effective with the March 2013 quarterly dividend payment.***

CenturyLink also expects to utilize a portion of its free cash flow generated in 2013 and 2014 to repay debt and maintain leverage at less than 3.0 times EBITDA (earnings before interest, taxes, depreciation, and amortization).

"CenturyLink has made significant progress over the last several years in improving our top-line revenue trend," said Glen F. Post, III, chief executive officer and president. "We have continued to achieve strong operating revenue performance, cash flows and broadband growth, and we remain focused on enhancing long-term shareholder value.

"The share repurchase program, which will be accretive to free cash flow per share, along with our very competitive cash dividend, will enable us to significantly increase the total cash returned to our shareholders in 2013 and 2014. Additionally, we are positioning the company to maintain a dividend payout ratio of less than 60 percent of free cash flow after we have fully utilized our federal income tax net operating loss carryforwards," said Post.

"We are confident that the capital allocation initiatives we announced today will allow us to continue our investments to drive strategic revenue growth, while maintaining our focus on creating long-term shareholder value,'' concluded Post. [Emphasis added]

53.     Also on February 13, 2013, Defendants issued a press release entitled

"CenturyLink Reports Fourth Quarter And Full-Year 2012 Earnings."  The press release stated,

in relevant part:

Achieved fourth quarter operating revenues of $4.58 billion and full-year operating revenues of $18.4 billion, in line with guidance.

Improved year-over-year rate of revenue decline to 1.5% in fourth quarter 2012 compared to 3.2% year-over-year decline in fourth quarter 2011.

Realized strong growth in high-speed Internet subscribers of more than 41,000 during fourth quarter 2012.

Achieved Adjusted Diluted EPS I of $0.67 compared to $0.55 in fourth quarter 2011.

Generated Free Cash Flow of $610 million, excluding special items CenturyLink, Inc. (NYSE: CTL) today reported solid operating revenues, operating cash flow and free cash t1ow for fourth quarter and full-year 2012.

"We are pleased with our fourth quarter and full-year results, which reflect the continued execution of our strategy to focus on investing in on key growth drivers to further stabilize our top-line revenue while aligning our operating costs with revenue and growth opportunities. Our investments in broadband, Prism TV, fiber-to- the-tower and data hosting continue to provide a broad base of organic revenue growth opportunities and helped drive pro forma full-year operating revenue improvement to a 1.7% decline in 2012 compared to a 3.8% decline a year ago," said Glen F. Post, III, chief executive officer and president.

"We realized solid strategic data and hosting revenue growth during 2012 driven by strong demand from our business customers for high bandwidth data services, colocation and managed services, including cloud. The December commercial launch of our new savvisdirect product, which meets the increasing demand for a simplified approach to cloud computing, reflects the combined strength of our strategic asset portfolio and employee innovation.

"We remain focused on delivering innovative communications and hosted IT solutions that meet the needs of customers, and we continue to expect further improvement in our top-line revenue trend this year and to reach revenue stabilization in 2014," Post concluded.

**Fourth Quarter Highlights**

- Improved year-over-year revenue trend to a 1.5% rate of decline compared to a 3.2% decline in fourth quarter 2011.
- Achieved free cash flow of $610 million, excluding special items and integration-related capital expenditures.
- Ended fourth quarter 2012 with approximately 5.85 million high-speed Internet subscribers; adding more than 41,000 customers in the fourth quarter.
- Improved access line loss trend during fourth quarter 2012 to a 5. 7% annual decline compared to a 6.6% annual decline in fourth quarter 2011.
- Added more than 10,000 CenturyLink Prism TV subscribers in fourth quarter 2012, ending the quarter with nearly 115,000 subscribers in service.
- Generated sequential recurring revenue growth in our Enterprise Markets Network segment.
- Opened a new data center in Frankfurt, Germany, bringing total data centers to 54 throughout North America, Europe and Asia, with total sellable f1oor space of approximately 1.4 million square feet.

54.     As a result of these disclosures, the price of CenturyLink's stock plummeted from $41.69 per share on February 13, 2013 to close at $32.27 per share on February 14, 2013, a decline of over 22%.

55.     Analysts seized upon the Company's disclosure, and emphasized its surprise nature.  For example, in a report titled ***"Dividend Cut From Left Field,"*** Thomas Seitz, an analyst with Jefferies & Co. stated: "CenturyLink reported solid 4Q12 results, ***but that was overshadowed by an unexpected dividend cut of 25%.***  The company also instituted a $2.0B share BB, and management indicated it was actually returning more cash to shareholders with this structure. It won't matter tomorrow." [Emphasis added.]

56.     In a report titled "You can't escape your roots; secular wireline pressures drive an unexpected dividend cut; downgrading to UP," Kevin Smithen and Zach Horat, analysts with Macquarie Capital stated: "In light of CTL's ***surprise qtrly. dividend cut to $0.54 from $0.725*** and slight cuts to our already-below-consensus 2013 FCF estimates, we are downgrading CTL to Underperform from Neutral and cutting our PT to $33 based on a 6.5% yield on the new dividend rate.  Recent experience with FTR and Alaska is that rural telcos tend to overshoot on the downside following dividend cuts as income funds and retail investors sell.  ***CTL's cut was unexpected and the near-term reaction could be severe, in our opinion.*** [ ... ] ***CTL mgmt.finally threw in tile towel on its Investment Grade credit ratings,*** announcing a change in capital allocation strategy, including a 25% dividend cut and $2bn buyback program." [Emphasis added.]

57.     In a report titled "Downgrading CTL Given Lower Outlook on Shareholder Returns, Believe Stock Is Fairly Valued Post-Dividend Cut," analysts with J.P. Morgan stated: "CTL saw the writing on the wall in 2015, cutting dividend now. With cash taxes in 2015

looming, **CTL ripped the band-aid off and did what it believes is inevitable - cutting the dividend by 25% today.**   The company believes the new level is sustainable and leaves room to de-lever.   In the meantime the company did a 2-year, $2 billion buyback authorization-essentially returning the excess cash f1ow before the tax hit as buybacks rather than dividend. While we find the discipline admirable (we can't think of another example of this in telecom), the pain for CTL's shareholders is likely to be extreme."   [Emphasis added.]

58.     In a report titled "4Q Review: Surprise Dividend Cut, But Yield & Buybacks Remain Attractive," analysts with Morgan Stanley stated: "Dividend Cut Surprises, Overshadows Buyback.  **We did not expect a dividend cut given the strong FCF payout ratio and improving trends**, but the mix shift toward lower margins and higher taxes in 2015 drove management's cautious decision, desiring to keep the payout ratio below 60% in 2015." [Emphasis added.]

### THE INSIDER SELLING

59.     On April 16, 2012, defendants Post, Goff, and Puckett entered into so-called 10b5-1 trading plans, pursuant to which these defendants would sell CenturyLink shares at set prices on set dates (the "10b5-1 Plans").   Under the guise of the 10b5-1 Plans, and while in possession of material, adverse, non-public information, defendants Post, Goff, and Puckett sold massive amounts of CenturyLink stock in August 2012.  In addition, and not pursuant to a 10b5-1 trading plan, defendants Melville, Moreau, Nichols, Zimmel, Owens, Gephardt, and Ousley sold massive amounts of CenturyLink stock between August 2012 and December 2012, while in possession of material, adverse, non-public information.

60.     The illicit insider sales by the Insider Selling Defendants are detailed in the chart below.  "Automatic Sale" indicates that the sale was made pursuant to one of the 10b5-1 Plans entered into in April 2012.

|  | Insider | Shares |  | Proceeds ($) |
|---|---|---|---|---|
| Dec 30, 2012 | Ousley | 126,346 | Disposition (Non Open Market) at $39.12 per share. | 4,942,655 |
| Dec 6, 2012 | Gephardt | 1,780 | Sale at $37.84 per share. | 67,355 |
| Dec 2, 2012 | Melville | 500 | Sale at $38.93 per share. | 19,465 |
| Nov 27, 2012 | Owens | 5,000 | Sale at $38.24 per share. | 191,200 |
| Nov 11, 2012 | Zimmel | 10,938 | Sale at $39.05 per share. | 427,128 |
| Nov 11, 2012 | Nichols | 1,300 | Sale at $39.01 per share. | 50,712 |
| Nov 8, 2012 | Melville | 1,400 | Sale at $39.06 per share. | 54,684 |
| Aug 14, 2012 | Melville | 3,001 | Sale at $42.63 per share. | 127,932 |
| Aug 13, 2012 | Moreau | 2,246 | Sale at $42.67 - $42.73 per share. | 96,000 |
| Aug 9, 2012 | Melville | 600 | Sale at $42.40 per share. | 25,440 |
| Aug 8, 2012 | Post | 100,000 | Automatic Sale at $43.05 per share. | 4,305,000 |
| Aug 8, 2012 | Goff | 10,000 | Automatic Sale at $43.27 per share. | 432,700 |
| Aug 8, 2012 | Puckett | 50,000 | Automatic Sale at $43.07 per share. | 2,153,500 |
| *Total:* | | *313,111* | | *$13,757,773* |

## DERIVATIVE AND DEMAND ALLEGATIONS

61.    Plaintiff brings this action derivatively in the right and for the benefit of CenturyLink to redress the breaches of fiduciary duty and other violations of law by Defendants.

62.    Plaintiff will adequately and fairly represent the interests of CenturyLink and its shareholders in enforcing and prosecuting its rights.

63.    The Board currently consists of the following thirteen (13) directors: defendants Post, Hanks, Boulet, Brown, Gephardt, McCray, Melville, Nichols, Owens, Perry, Roberts, Siegel, and Zimmel.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, for the following reasons:

a. During the Relevant Period, defendants Post, Melville, Nichols, Zimmel, Owens, and Gephardt each illicitly sold shares of CenturyLink stock while in possession of material, adverse, non-public information, during a time in

- 20 -

which CenturyLink stock was artificially inflated due to Defendants' false and misleading statements.  As a result of these illicit sales, defendants Post, Melville, Nichols, Zimmel, Owens, and Gephardt each received direct financial benefits not shared with CenturyLink shareholders, and are therefore each directly interested in a demand.  Further, defendants Post, Melville, Nichols, Zimmel, Owens, and Gephardt each are interested in a demand because they face a substantial likelihood of liability for their breaches of fiduciary duties of loyalty and good faith.   Accordingly, demand upon defendants Post, Melville, Nichols, Zimmel, Owens, and Gephardt is futile;

b.  The principal professional occupation of defendant Post is his employment with CenturyLink as the President and CEO, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits.   In addition, according to the Company's Proxy Statement filed with the SEC on Form DEF 14A on April 10, 2013 (the "2013 Proxy"), Defendants have admitted that defendant Post is not independent.  Moreover, defendant Post is directly interested in this action due to his August 8, 2012 sale of his personally held CenturyLink stock.  Thus, defendant Post lacks independence from demonstrably interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action.  In addition, defendant Post faces a substantial likelihood of liability for breach of fiduciary duties in connection with his August 8, 2012 sale his personally held CenturyLink stock;

c.  The principal professional occupation of defendant Hanks between 1980 and 2001 was his employment with CenturyLink as COO, SVP—Corporate Development and Strategy, CFO, SVP—Revenues and External Affairs, and President—Telecommunications Services, pursuant to which he received substantial monetary compensation and other benefits.  Further, defendants Boulet, Melville, Perry, and Post were all members of the Board when defendant Hanks held at least one of these positions.   Thus, defendant Hanks lacks independence from demonstrably interested directors (and in particular defendants Boulet, Melville, Perry, and Post), rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action;

d.  Defendant Gephardt is CEO, President, and a principal of Gephardt Group Labor Advisory, LLC ("Gephardt Group").  In 2012, CenturyLink paid fees of approximately $279,400 to Gephardt Group for consulting services.  In addition, according the 2013 Proxy, Defendants have admitted that defendant Gephardt is not independent.  Thus, defendant Gephardt lacks independence from demonstrably interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action.  In addition, defendant Gephardt faces a substantial likelihood of liability for breach of fiduciary duties in connection with his December 6, 2012 sale his personally held CenturyLink stock;

- 21 -

e. During the Relevant Period, defendants Hanks, Brown, Roberts, and Zimmel served as members of the Audit Committee. Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee were and are responsible for, *inter alia*, reviewing the Company's annual and quarterly financial reports, reviewing the integrity of the Company's internal controls, and reviewing the earnings press release, financial information, and earnings guidance to be provided to investors, analysts, or rating agencies. Defendants Hanks, Brown, Roberts, and Zimmel breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted the Company to disseminate false and misleading statements in the Company's SEC filings and other disclosures and caused the above-discussed internal control failures. Therefore, defendants Hanks, Brown, Roberts, and Zimmel each face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile; and

f. Defendants Post, Hanks, Boulet, Brown, Gephardt, McCray, Melville, Nichols, Owens, Perry, Roberts, Siegel, and Zimmel (i.e. the entire Board) have been named as defendants in this action. Plaintiff has made no effort to secure action from these directors for the reason that these defendants constitute the entire Board and any demand on these defendants to bring an action in the name of the corporation against themselves would be futile.

## COUNT I
## AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY FOR DISSEMINATING FALSE AND MISLEADING INFORMATION

64. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

65. As alleged in detail herein, each of the Defendants (and particularly the Audit Committee Defendants) had a duty to ensure that CenturyLink disseminated accurate, truthful, and complete information to its shareholders.

66. Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to CenturyLink shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings and other public statements and disclosures as detailed herein. These actions could not have been a good faith exercise of prudent business judgment.

67.     As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

## COUNT II
## AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO MAINTAIN INTERNAL CONTROLS

68.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

69.     As alleged herein, each of the Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

70.     Defendants willfully ignored the obvious and pervasive problems with CenturyLink's internal controls practices and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

71.     As a direct and proximate result of the Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

## COUNT III
## AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO PROPERLY OVERSEE AND MANAGE THE COMPANY

72.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

73.     Defendants owed and owe CenturyLink fiduciary obligations.  By reason of their fiduciary relationships, Defendants specifically owed and owe CenturyLink the highest obligation of good faith, fair dealing, loyalty, and due care.

74.     Defendants, and each of them, violated and breached their fiduciary duties of

care, loyalty, reasonable inquiry, oversight, good faith, and supervision.

75.     As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, CenturyLink has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

76.     As a result of the misconduct alleged herein, Defendants are liable to the Company.

77.     Plaintiff, on behalf of CenturyLink, has no adequate remedy at law.

**COUNT IV**
**AGAINST ALL DEFENDANTS FOR UNJUST ENRICHMENT**

78.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

79.     By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of and to the detriment of CenturyLink.

80.     Plaintiff, as a shareholder and representative of CenturyLink, seeks restitution from these Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

**COUNT V**
**AGAINST THE INSIDER SELLING DEFENDANTS FOR BREACH OF FIDUCIARY**
**DUTIES  FOR INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION**

81.      Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

82.     At the time of the stock sales set forth herein, the Insider Selling Defendants were in possession of material, adverse, non-public information described above, and sold CenturyLink common stock on the basis of such information.

- 24 -

83. The information described above was proprietary, non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company that the Insider Selling Defendants used for their own benefit when they sold CenturyLink common stock.

84. At the time of their stock sales, the Insider Selling Defendants knew that Defendants were planning to drastically alter CenturyLink's capital allocation plans by committing a significant amount of free cash flow to the repurchase of billions of dollars of common stock and significantly altering the dividend policy. The Insider Selling Defendants' sales of CenturyLink common stock while in possession and control of this material adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

85. Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby. Plaintiff, on behalf of CenturyLink, has no adequate remedy at law.

## COUNT VI
### AGAINST ALL DEFENDANTS FOR ABUSE OF CONTROL

86. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

87. Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence CenturyLink, for which they are legally responsible. In particular, Defendants abused their positions of authority by causing or allowing CenturyLink to misrepresent material facts regarding its financial position and business prospects.

88. As a direct and proximate result of Defendants' abuse of control, CenturyLink has sustained significant damages.

89.    As a result of the misconduct alleged herein, Defendants are liable to the Company.

90.    Plaintiff, on behalf of CenturyLink, has no adequate remedy at law.

**COUNT VII**
**AGAINST ALL DEFENDANTS FOR GROSS MISMANAGEMENT**

91.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

92.    Defendants had a duty to CenturyLink and its shareholders to prudently supervise, manage, and control the operations, business, and internal financial accounting and disclosure controls of CenturyLink.

93.    Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of CenturyLink in a manner consistent with the duties imposed upon them by law. By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence, and candor in the management and administration of CenturyLink's affairs and in the use and preservation of CenturyLink's assets.

94.    During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused CenturyLink to engage in the scheme complained of herein, which they knew had an unreasonable risk of damage to CenturyLink, thus breaching their duties to the Company.  As a result, Defendants grossly mismanaged CenturyLink.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.      Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.      Directing CenturyLink to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.      Awarding to CenturyLink restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Defendants;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

<strong>JURY DEMAND</strong>

Plaintiff demands a trial by jury.

Dated: July 8, 2013                          LEMMON LAW FIRM, LLC


                                             /s/ ANDREW A. LEMMON
                                             ANDREW A. LEMMON (#18302)
                                             IRMA L. NETTING (#29362)
                                             15058 River Road
                                             PO Box 904
                                             Hahnville, LA 70057
                                             Telephone:     (985) 783-6789

Facsimile:      (985) 783-1333
andrew@lemmonlawfirm.com
irma@lemmonlawfirm.com


**THE WEISER LAW FIRM, P.C.**
ROBERT B. WEISER
BRETT D. STECKER
JEFFREY J. CIARLANTO
22 Cassatt Avenue, First Floor
Berwyn, PA 19312
Telephone:  (610) 225-2677
Facsimile:  (610) 408-8062
rw@weiserlawfirm.com
bds@weiserlawfirm.com
jjc@weiserlawfirm.com

*Attorneys for Plaintiff*